NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260337-U

NO. 4-26-0337

IN THE APPELLATE COURT

FILED
August 4, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| JACK WALTER, | ) | Appeal from the |
|     Petitioner-Appellee, | ) | Circuit Court of |
|     v. | ) | Tazewell County |
| HAILI WILLIAMS, | ) | No. 25OP895 |
|     Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Suzanne L. Patton, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Presiding Justice Steigmann and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, upholding a plenary order of protection, where (1) respondent's lack of counsel did not deprive her of due process, (2) the trial court considered the proper statutory factors and its decision was not against the manifest weight of the evidence, and (3) respondent did not allege actions by the trial judge that amounted to bias or prejudice.

¶ 2    In February 2026, the trial court granted petitioner, Jack Walter, a plenary order of protection against respondent, Haili Williams, his ex-girlfriend and mother of his child. Williams appeals, arguing the court erred in granting the order of protection. We affirm.

¶ 3                            I. BACKGROUND

¶ 4    Walter and Williams had a dating relationship, which resulted in one minor child, who was born in 2020. In November 2025, Walter filed a petition for emergency and plenary orders of protection, alleging Williams was harassing and stalking him through excessive telephone calls to him and to the police. An emergency order of protection was entered on

November 14, 2025, which ordered Williams to cease her acts of harassment and stay away from Walter and their child. The emergency order further denied Williams any parenting time with the child. The emergency order was extended twice, and the hearing on the plenary order of protection was held on February 20, 2026.

¶ 5　　　　At the hearing, Walter testified he shared one child with Williams. Walter started dating Williams in Hawaii. After he moved back to Illinois, he invited Williams to move in with him, which she did. Thereafter, after Williams moved out, she contacted Walter to say she was pregnant. In 2020, when their child was still an infant, Walter filed a parentage action, and a parenting plan was entered in September 2024. Under the parenting plan, Walter had the majority of parenting time with the child and all the decision-making authority. Williams was granted 10 hours per quarter of supervised visits with the child. Walter testified Williams did not exercise her right to supervised visits, but she did FaceTime with the child twice a week. Walter was not sure where Williams resided, but he thought she resided in Hawaii.

¶ 6　　　　Walter identified an exhibit documenting telephone calls to him from Williams, as well as numerous police visits prompted by calls made by Williams to the police. The timeline of the exhibit began on October 19, 2025, about a month before Walter sought the order of protection, with two missed calls and then a visit from the police at 2:35 a.m. The police officers informed Walter they had been called to do a wellness check and ensure the child was safe. The police officers asked about Walter's interactions with Williams, and Walter provided the police officers with the parenting plan. The next day, two other police officers arrived at Walter's home to investigate a report made by Williams that Walter was harming the child and the child had a sexually transmitted disease. Walter spoke with the police officers and allowed the police officers to speak to the five-year-old child. On October 30, 2025, a police officer arrived at

Walter's house at 11:13 p.m. to investigate a noise complaint. Walter was getting ready for bed, and he was not playing any music. The child was in bed, asleep.

¶ 7    According to Walter, Williams also made a report to police in Tennessee, where Walter's father resided, alleging Walter and his father were harming the child. The Tennessee police called Walter, who was in Illinois with the child. Williams also reached out to the child's school and church. Walter reported the church's pastor called him on November 12, 2025, to inform Walter that Williams had called about 10 times during the prior church service. During that same church service, Walter had received a telephone call from a police officer, who later came to the house to check on the child. Walter also testified to many missed calls and voicemails from Williams. The next day, Walter received another telephone call from a police officer. By that point, according to Walter, the police officers were calling for wellness checks rather than showing up at his door.

¶ 8    Walter denied ever harming his child. He had previously been investigated by the Illinois Department of Children and Family Services in 2021 due to allegations made by Williams. The allegations were unfounded. Walter testified that Williams's actions affected his mental, emotional, and physical well-being and his sleep. Walter testified he slept on a cot between his child's bedroom and the front door. Walter installed privacy screens on his front door and installed a Ring doorbell because he was afraid of what Williams would do to him or the child. Walter feared the child would be taken into foster care because of the false accusations by Williams or Williams would harm or kidnap the child. Walter described an incident in 2020, when Walter, Williams, and the child were in Florida visiting Walter's grandfather. Williams cut the screen in the bedroom, and Walter believed she planned to leave with the child that night.

¶ 9         Williams, appearing *pro se*, testified she was the mother of the child she shared with Walter. She lived in Honolulu, Hawaii. Williams admitted she had been hospitalized for mental illness approximately five times since 2020, but she did not have a diagnosis or take any prescription medication. She was seeing a counselor, but she could not recall the last name of the counselor. Williams reviewed Walter's exhibits, and she admitted to the general accuracy of the list of phone calls, missed calls, and missed FaceTime calls. She also admitted she had called the police over 40 times in a month. In fact, Williams submitted an exhibit that documented she called the police in November 2025 a total of 46 times in a nine-day span. Williams testified she did so to keep the child safe. She also contacted the police in Tennessee after locating Walter's father through a Google search. She contacted Walter's church a few times, asking the pastor to watch over the child, and she contacted the child's school several times.

¶ 10         When asked for proof of harm to the child, Williams stated she witnessed him being harmed in 2020, the night she cut the window screen. She admitted she had no other evidence and had not visited the child in person since March or April 2024. Since the parenting plan was entered in September 2024, she had not exercised any of her supervised visits, but she did FaceTime with the child two or three times a week. She claimed she could not exercise her supervised visitation with the child because she could not afford the flight from Hawaii. Williams sought to admit into evidence character letters from people in her life in Hawaii. Upon objection from Walter, the trial court ruled the letters were not admissible.

¶ 11         The trial court granted the plenary order of protection for two years, ordering Williams to stay away from Walter and the child and denying Williams any visits with the child. The court stated it considered the severity, frequency, pattern, and consequences of Williams's behavior. The court found Williams had emotionally harmed the child by abusing the system.

- 4 -

Williams engaged in actions she knew to be harassing to Walter and the child. The actions were not necessary to accomplish a reasonable purpose, would cause a reasonable person emotional distress, and did cause emotional distress to Walter and the child. The court noted that Williams may eventually be able to be a positive influence for the child, but she needed to address her mental health first. Considering the best interest of the child, the court did not feel there were any conduct provisions that would currently allow Williams to have contact with the child.

¶ 12     This appeal followed.

¶ 13                                II. ANALYSIS

¶ 14     Williams appealed, arguing the trial court erred in granting the plenary order of protection because (1) she was denied due process in that she lacked representation and was not afforded a reasonable opportunity to be heard, (2) the court focused on the harm to Walter and failed to identify harm to the child, and (3) the court demonstrated judicial bias and partiality in favor of Walter.

¶ 15                                A. Due Process

¶ 16     Williams contends she was denied due process when her character letters were ruled inadmissible as evidence, and she lacked proper representation and a sufficient understanding of evidentiary procedure to meaningfully challenge the evidence presented by Walter. Walter argues there was no due process violation because Williams participated in the hearing. She was not entitled to appointed counsel, and she made a choice to represent herself rather than hire an attorney.

¶ 17     "It is a constitutional right that no State may deprive a person of life, liberty or property without due process of law." *Balmoral Racing Club, Inc. v. Illinois Racing Board*, 151 Ill. 2d 367, 405 (1992); see U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. The concept of

due process encompasses both procedural and substantive protections. *People v. Pepitone*, 2018 IL 122034, ¶ 13. "Substantive due process bars governmental action that infringes upon a protected interest when such action is itself arbitrary." *Id.* "[P]rocedural due process governs the methods by which the state may deprive an individual of a protected interest." *People ex rel. Klaeren v. Village of Lisle*, 316 Ill. App. 3d 770, 777 (2000), *aff'd*, 202 Ill. 2d 164 (2002). Here, Williams challenges the process itself, raising a procedural due process claim. We review *de novo* whether a party's procedural due process rights were violated. *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 271 (2004).

¶ 18    "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The process that is constitutionally required is a flexible concept, dependent on the demands of the particular situation. *Kopf v. Kelly*, 2024 IL 127464, ¶ 82. When evaluating procedural due process claims, courts should consider and balance the following:

> " 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Lyon*, 209 Ill. 2d at 277 (quoting *Mathews*, 424 U.S. at 335).

¶ 19    The private interest at issue here was Williams's fundamental interest in the control, custody, and care of her child. See *In re R.H.*, 2024 IL App (4th) 241048, ¶ 35

("[P]arents have a fundamental liberty interest in raising and caring for their children."). We note the majority of the limitations on Williams's parenting time were due to an order entered in a separate parentage action, the validity of which is not before us. However, the practical effect of the order of protection here removed Williams's right to limited visitation with the child. Thus, while the order prohibiting contact with her child was temporary and not a complete termination of her parental rights, it did affect her fundamental interest in raising and caring for her child.

¶ 20    We must balance the above right against the process afforded Williams. After being served with a summons in Hawaii, Williams was present in the Illinois court for the hearing on the plenary order of protection. She fully participated in the hearing. She contends, however, the process was deficient because she was not represented by an attorney and she did not understand the evidentiary rules at the hearing. Williams does not assert she hired counsel who was not allowed to participate. Rather, she appears to contend counsel should have been appointed to represent her. Williams does not cite any statutory provision requiring the appointment of counsel, and there is no indication in the record she sought the appointment of counsel or sought a continuance so she could retain counsel. See *People ex rel. Williams v. Rhodes*, 185 Ill. App. 3d 114, 116-18 (1989) (applying the *Mathews* factors to hold a stepfather did not have a due process right to counsel when opposing the issuance of an order of protection). Based on Williams's participation and actions in the trial court and her failure to identify any additional procedural safeguards to which she was entitled, we conclude the risk of an erroneous deprivation of her interest in the child was minimal.

¶ 21    The trial court, in granting the plenary order of protection, was providing a remedy under the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2024)), with the recognized purpose of "[s]upport[ing] the efforts of victims of domestic

- 7 -

violence to avoid further abuse by promptly entering and diligently enforcing court orders which prohibit abuse and, when necessary, reduce the abuser's access to the victim." *Id.* § 102(4). Therefore, "the State had an interest in the welfare of the child and desired an accurate and just decision, [as well as] a pecuniary interest in making the decision in the most economical manner possible." *Williams*, 185 Ill. App. 3d at 116.

¶ 22　　　　It was the trial court's role to determine whether Williams had committed acts of abuse or harassment. See 750 ILCS 60/214(a) (West 2024) ("If the court finds that petitioner has been abused by a family or household member ***, an order of protection prohibiting the abuse, neglect, or exploitation shall issue."); *id.* § 103(1) (defining abuse to include harassment). Williams's primary challenge to the process is that she sought to introduce letters into evidence at the hearing, but they were ruled inadmissible, and she lacked the legal knowledge to seek their admission. Williams described the letters as character letters from "people in [her] life who are in Hawaii that say that [she's] a good mother." The court found the letters had limited relevance to the issues raised in an order of protection proceeding, and it could not determine the credibility of the letters' authors without them being presented as witnesses.

¶ 23　　　　Proceedings to obtain an order of protection are governed by the rules of evidence and civil procedure. *A.A. v. Nita A.*, 2023 IL App (1st) 230011, ¶ 38; 750 ILCS 60/205(a) (West 2024). Here, Williams sought to introduce into evidence letters written by people who were not available to testify and to be cross-examined. Thus, the letters were inadmissible hearsay. See *In re Marriage of Kutinac*, 182 Ill. App. 3d 377, 384 (1989) ("A letter is hearsay as to its contents and is not admissible unless it falls within one of the exceptions to the hearsay rule."); see also Ill. R. Evid. 802 (eff. Jan. 1, 2011) (stating that hearsay is not admissible unless an exception applies). As the trial court noted, it had no way of determining the validity of the

letters or the credibility of the authors of those letters. See *Kutinac*, 182 Ill. App. 3d at 384 ("The rule [against hearsay] exists primarily because of the importance and necessity of cross-examination."). Even though Williams was proceeding *pro se*, she was still required to comply with the court's rules and procedures. See *In re Estate of Pellico*, 394 Ill. App. 3d 1052, 1067 (2009) ("[*P*]*ro se* litigants are presumed to have full knowledge of applicable court rules and procedures and must comply with the same rules and procedures as would be required of litigants represented by attorneys.").

¶ 24         Whether Williams was familiar with the rules of evidence, we conclude it would have had no impact on the proceedings because she admitted to committing the actions of harassment that were alleged in the order of protection. The letters sought to be introduced by Williams were evidence of her character; Williams has never asserted the letters were offered as evidence of a material fact relevant at the hearing. See 750 ILCS 60/213.1(3) (West 2024) (creating a hearsay exception for order of protection proceedings under the Act if the court determines "the statement is offered as evidence of a material fact"). After our review of the record, including the extent of Williams's participation in the hearing, and balancing the above factors, we conclude Williams had a meaningful opportunity to be heard and was not denied due process.

¶ 25                    B. Evaluation of Harm to the Minor Child

¶ 26         Williams contends the trial court, in granting the plenary order of protection, focused on harm to Walter and failed to make any findings of harm to the child and properly evaluate the best interest of the child. Further, the court's decision to bar all contact between Williams and the child was against the manifest weight of the evidence.

- 9 -

¶ 27          "In any proceeding to obtain an order of protection, the central inquiry is whether the petitioner has been abused." *Best v. Best*, 223 Ill. 2d 342, 348 (2006). Pursuant to section 214(a) of the Act, the trial court shall issue an order of protection if it finds the petitioner has been abused and, for a plenary order of protection, met the requirements of section 219 of the Act. 750 ILCS 60/214(a) (West 2024). Section 219 of the Act provides:

> "A plenary order of protection shall issue if petitioner has served notice of the hearing for that order on respondent, in accordance with Section 211, and satisfies the requirements of this Section for one or more of the requested remedies. For each remedy requested, petitioner must establish that:
>
>> (1) the court has jurisdiction under Section 208;
>>
>> (2) the requirements of Section 214 are satisfied;
>>
>> (3) a general appearance was made or filed by or for respondent or process was served on respondent in the manner required by Section 210; and
>>
>> (4) respondent has answered or is in default." *Id.* § 219.

¶ 28          For purposes of the Act, abuse is defined as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation." *Id.* § 103(1). Harassment "means knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7). The petition must be proven by a preponderance of the evidence. *Id.* § 205(a).

¶ 29          Before granting an order of protection, the trial court is required to consider the relevant applicable statutory factors and make its findings in an official record or writing. *Id.*

§ 214(c)(3). Such relevant factors include "the nature, frequency, severity, pattern and consequences of the respondent's [actions]." *Id.* § 214(c)(1)(i). A finding of abuse made under the Act will be reversed only if it is against the manifest weight of the evidence. *Best*, 223 Ill. 2d at 350.

¶ 30　　　　Here, we conclude the trial court made the requisite findings on the record, and its findings were not against the manifest weight of the evidence. The court's written order indicated its findings were made orally on the record and were incorporated in the written order. The court stated it considered the severity, frequency, pattern, and consequences of Williams's pattern of behavior and concluded there was substantial evidence that Williams was harassing both Walter and their child. The court noted Williams admitted to making the numerous phone calls alleged in the petition, and she did not have any evidence to support her allegations the child was being abused by Walter. Numerous phone calls were made to the police, requiring the child to be woken up in the middle of the night and have multiple interactions with law enforcement officers. The court found Williams's actions emotionally harmed Walter and the child, and it was concerned about Williams's future actions. The court determined it was in the best interest of the child to grant the plenary order of protection and bar Williams's access to the child. See 750 ILCS 60/214(b)(7) (West 2024) (allowing for restrictions on parenting time as a remedy under the Act). The court noted the order was not a permanent termination of Williams's right to the child and suggested Williams could regain her visits with the child in the future if she availed herself of the help she needed.

¶ 31　　　　　　　　　　C. Alleged Judicial Bias

¶ 32        Williams contends the trial court demonstrated bias and partiality against her when it made disparaging and unnecessary remarks toward her, particularly characterizations suggesting mental instability, and openly validated Walter while criticizing her.

¶ 33        "A trial court must conduct itself in a fair and impartial manner, and the court may not show bias or prejudice against either party." *People v. Fisher*, 2023 IL App (4th) 220717, ¶ 30. "A trial judge is presumed to be impartial, and the party challenging the judge's impartiality bears the burden of overcoming this presumption." *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96. Allegations of judicial bias must be evaluated within the context of the case. *Id.* An opinion or feeling expressed by a judge does not indicate bias or prejudice; rather, there must be a showing of an "active personal animosity, hostility, ill will or distrust towards the defendant." *People v. Hooper*, 133 Ill. 2d 469, 513 (1989). We review *de novo* the question of whether a judge's conduct amounted to bias or prejudice. *Romero*, 2018 IL App (1st) 143132, ¶ 96.

¶ 34        As evidence of the trial judge's partiality toward Walter, Williams points to the fact the judge commended Walter for his demeanor and laughed at some of Walter's testimony. At the same time, Williams contends the judge made disparaging remarks toward her, suggesting something was off because Williams did not laugh at the same testimony. Further, the judge made comments suggesting Williams was mentally unstable.

¶ 35        The record shows any comments by the trial judge, alone or cumulatively, are not sufficient to overcome the presumption of impartiality. The comments indicate how the judge interpreted the evidence, including Williams's acknowledged mental health hospitalizations, offered at the hearing on the order of protection.

¶ 36                        III. CONCLUSION

¶ 37    For the reasons stated, we affirm the trial court's judgment.

¶ 38    Affirmed.